J^LOLLEY, J.
Daryl Dixon appeals his conviction and sentence which arise from the First Judicial District Court, Parish of Caddo, State of Louisiana. Dixon entered a guilty plea to possession of a Schedule II controlled dangerous substance (“CDS”), cocaine, with intent to distribute in violation of La. R.S. 40:967(A)(1) and was sentenced to serve seven years imprisonment at hard labor. Dixon’s conviction and sentence are affirmed for the reasons assigned.
FACTS
Trooper Sean Joyner of the Louisiana State Police testified that on October 23, 2002, he saw Dixon’s vehicle drift over the white fog line and then across the center line on 1-20 in Caddo Parish. Trooper Joyner initiated a traffic stop to assess the driver for impairment. Upon making the stop, Tpr. Joyner asked Dixon to step out of the vehicle and show his driver’s license. According to Tpr. Joyner’s testimony, when Dixon produced his license, his hand was trembling. Trooper Joyner explained to Dixon why he had stopped him, and Dixon responded that he was changing radio stations. Upon the request of the trooper, Dixon produced vehicle registration, but by then both of his hands were trembling. When Tpr. Joyner asked who owned the vehicle, Dixon responded it belonged to “Daphne.” However, the registration document indicated that it belonged to Rachel Dancer. Dixon told Tpr. Joyner that he was coming from Dallas to gamble at one of the Bossier City casinos, but he did not know the name of the casino.
Dixon was instructed to stay in the car while the trooper checked his license and criminal history. The check revealed that Dixon had a valid |3license and was on parole for a cocaine violation. Trooper Joyner testified that he verified that the car was not stolen and further testified that he always checked criminal histories if someone appeared “overly nervous” at a traffic stop. The trooper stated that Dixon had shaking hands and was “tense” while he talked to him. He stated that he did not find Dixon’s account believable because he had not told the truth about who owned the car.
Trooper Joyner informed Dixon that he decided not to issue a ticket and gave all the paperwork back to him. He then engaged Dixon in conversation, asking him if he had any prior tickets. A few minutes after Tpr. Joyner returned the paperwork to Dixon he asked him to consent to a search.[1] Subsequently, Tpr. Todd Marlowe arrived at the scene. Next, Dixon read over a consent to search form, which he signed voluntarily. While Marlowe performed a pat down search of Dixon for weapons and to maintain the troopers’ safety, Tpr. Joyner began a search of the vehicle. The consent form was admitted into evidence without objection. Following a search of the vehicle, Tpr. Joyner found the contraband (suspected cocaine) in the *375 trunk, inside the left rear quarter panel. Trooper Joyner explained at the hearing that he requested consent to search based on Dixon’s nervousness, his unbelievable story about gambling in Bossier City, and his criminal history. On cross-examination, Tpr. Joyner testified that after checking the paperwork and determining that Dixon had a valid license and that the car was not stolen, he decided to search the vehicle upon learning of 14Pixon’s criminal history. He did not suspect the presence of any controlled dangerous substances at that time, although he thought Dixon “might have been involved in some type of illegal activity.”
Trooper Marlowe testified that he assisted Tpr. Joyner in the traffic stop and that toward the end of the stop Dixon consented to a search of his vehicle. Trooper Marlowe testified that he stood to the side and rear of the vehicle with Dixon and made conversation, repeating some of Tpr. Joyner’s previous questions. Trooper Marlowe testified that he also noticed that Dixon was sweating profusely, had a trembling lip, and appeared “distracted.” On cross-examination, Tpr. Marlowe agreed that he had not told Dixon that he was free to leave after his paperwork was returned to him. He said the only reason he showed up was to assist on a search — that was why he had been called. Subsequently, Tpr. Marlowe said that Tpr. Joyner had not said anything about a search. Trooper Marlowe testified that when he arrived, Tpr. Joyner was telling Dixon that he was not issuing a ticket. According to Tpr. Marlowe, 30 seconds later Dixon signed the consent to search form. Trooper Marlowe further testified that it was normal to call for back-up whenever a trooper felt uneasy or suspicious at a traffic stop. In this case, Tpr. Marlowe admitted that he did not know specifically why Tpr. Joyner had called him.
Dixon was charged by bill of information with possession of a Schedule II CDS, cocaine, with intent to distribute. Dixon filed pretrial motions, including a motion to suppress evidence, contending that the seizure of the evidence was illegal and, therefore, inadmissible.
1 sAfter a hearing, the trial court granted Dixon’s motion to suppress. The trial court determined that the initial traffic stop was lawful. It found that the “only” thing Tpr. Joyner articulated to show suspicion of criminal activity was Dixon’s nervousness, and that Tpr. Joyner “exonerated” Dixon from the grounds for the traffic stop, but decided nonetheless to conduct a search.[2] The trial court stated that it was obvious by the troopers’ actions that Dixon could not “walk away.” It further found that Dixon was detained beyond the valid reason for the traffic stop without any additional basis or independent showing for believing a crime was being or had been committed. Accordingly, the trial court granted Dixon’s motion to suppress.
This court granted the state’s application for supervisory writ and made it peremptory, reversing the trial court’s ruling and remanding for further proceedings (“Dixon I”). In Dixon I, we concluded that under the circumstances of this case, the trooper was justified in extending the scope of his investigation after deciding not to issue a traffic citation, and his actions did not violate Dixon’s constitutional rights.
Thereafter, Dixon entered a guilty plea to possession of a Schedule II CDS, cocaine, with intent to distribute, pursuant to *376 State v. Crosby, 338 So.2d 584 (La.1976), preserving his right to appeal the denial of the Motion to Suppress while still denying his factual guilt. He was sentenced to serve the agreed-upon term of seven years imprisonment at hard labor. This appeal followed.
| .DISCUSSION
On appeal, Dixon argues that the trial court properly sustained a motion to suppress, and therefore, the evidence found in an illegal search of the vehicle on 1-20 should have been suppressed in this case. As a result, Dixon maintains that his guilty plea should be vacated and set aside.
Dixon contends that traffic stops are limited so that once the traffic issues are resolved, the subject of the stop must be set free. Dixon refers to the trial court’s statements during its questioning of Tpr. Joyner, and states that the trial court made the specific factual finding that the investigatory stop pursuant to the traffic violation had ended when Tpr. Joyner asked Dixon for consent to search. Specifically, he argues that the traffic stop ended when Tpr. Joyner told Dixon that he was not going to issue him a citation. Dixon cites United States v. Santiago, 310 F.3d 336 (5th Cir.2002), State v. Cowan, 1999-2888 (La.06/16/00), 763 So.2d 583, and La. C. Cr. P. art. 215.1(D). He argues that the second trooper (Marlowe) was on the scene to back up the search even before the consent was signed, and describes the troopers’ actions as “subtle coercion.” Although the troopers stated that they were concerned when Dixon could not name the casino he was visiting, he argues that the trial court was in the best position to weigh credibility on these issues. Dixon contends that this investigatory stop continued beyond the point where it was justified as an investigatory stop, and the search was a “mere whim” of the trooper and represents an overreaching. Dixon concludes in both his original and reply briefs that Santiago, supra remains “good law” and the trial court correctly applied it |7to a traffic stop, after which a new stop took place simply to ask for consent to search.
Initially, we note that an appellate court will not overturn its pretrial determination of admissibility unless the defendant presents new evidence tending to show the decision was patently erroneous and produced an unjust result. State v. Johnson, 438 So.2d 1091 (La.1983); State v. Taylor, 550 So.2d 712 (La.App. 2d Cir. 1989), writ denied, 556 So.2d 54 (La.1990).
In the case sub judice, no additional evidence was adduced because Dixon pled guilty. So, even if we were to consider the merits of Dixon’s appeal, Dixon does not point to any new evidence neither in argument or brief tending to demonstrate any unjustness or error in Dixon I. Accordingly, Dixon’s assignment of error is without merit.

Dixon’s detention

However, as to the merits of Dixon’s argument and the legality of his detention beyond that of the initial stop, we find that although decisions of federal appellate courts are considered persuasive, they are not binding on the courts of this state. State v. White, 321 So.2d 491, 494 (La.1975). Nevertheless, we do not find Dixon I to be in conflict with the Santiago court which stated that “[o]nce an officer’s suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion.” (Emphasis added). We find the state trooper in this case did meet the criteria of Santiago, supra and was justified in extending the scope of his investigation after deciding not to issue a traffic citation.
*377 Moreover, we find applicable to this instant case La. C. Cr. P. art. 215.1(D) which provides:
|sDuring detention of an alleged violator of any provision of the motor vehicle laws of this state, a trooper may not detain a motorist for a period of time longer than reasonably necessary to complete the investigation of the violation and issuance of a citation for the violation, absent reasonable suspicion of additional criminal activity. However, nothing herein shall prohibit a peace officer from compelling or instructing the motorist to comply with administrative or other legal requirements of Title 32 or Title 47 of the Louisiana Revised Statutes of 1950. (Emphasis added.)
Here, Dixon does not argue that the initial stop was unlawful. The supreme court in State v. Miller, 2000-1657 (La.10/26/01), 798 So.2d 947, 949-950, in dealing with a trooper’s actions taken following a lawful initial stop, held:
In the present case, the state trooper acted lawfully in stopping respondent after observing her cross the right-hand fog line of the highway. Given the lawfulness of the initial stop, the reasonableness of the escalating encounter be-tiueen respondent and the state trooper hinged on “whether the actions undertaken by the trooper following the stop were reasonably responsive to the circumstances justifying the stop in the first place, as augmented by information gleaned by the trooper during the stop. ” The trooper testified at the suppression hearing that he stopped respondent for reasons of public safety without intending to issue her a citation. Nevertheless, the trooper had the right to conduct a routine license and registration check and to engage respondent in conversation as he did so.
Respondent’s nervous demeanor as she responded to the trooper’s questions and her unlikely explanation for the overnight trip in a car rented by an individual who had been arrested for possession of a substantial amount of marijuana led to a shift in the trooper’s focus that was “neither unusual nor impermissible.”
(Emphasis added, citations omitted).
The Miller court went on to analyze whether the duration of the nearly hour-long stop reasonably correlated with the escalating level of suspicion as the trooper pursued a means of investigation likely to confirm or dispel the trooper’s suspicions without unnecessary delay.
|flAs there is no bright-line rule for determining when a lawful detention lasts too long, each instance must be assessed in view of the surrounding circumstances. State v. Arnold, 34,194 (La.App. 2d Cir.12/06/00), 779 So.2d 840. The diligence of the police officers in pursuing a means of investigation likely to quickly confirm or dispel their suspicions should be considered. See State v. Bostic, 26,000 (La.App. 2d Cir.05/04/94), 637 So.2d 591, writ denied, 94-1476 (La.10/14/94), 643 So.2d 159. In determining whether an officer had a reasonable suspicion of some separate illegal activity which justified further detention, the totality of the circumstances must be taken into account. State v. Kalie, 96-2650 (La.09/19/97), 699 So.2d 879.
In Dixon I, this court cited and compared United States v. Gonzalez, 328 F.3d 755 (5th Cir.2003), and State v. Lopez, 2000-0562 (La.10/30/00), 772 So.2d 90, to the instant case. It found that the continued detention of Dixon after a lawful traffic stop did not violate the Fourth Amendment where the evidence indicated that Dixon appeared nervous, was hesitant in answering basic questions about his travel *378 plans, lied about the ownership of the car he was driving, was driving on a route associated with drug trafficking and had been arrested for drug trafficking in the past. Under the totality of these circumstances, we find that the state trooper involved in this case was justified in extending the scope of his investigation because his reasonable suspicion of some separate illegal activity justified further detention. Thus, we do not find that Tpr. Joyner’s actions violated Dixon’s constitutional rights. This shift in the trooper’s |infocus was “neither unusual nor impermissible.” See State v. Miller, supra. We find no merit to Dixon’s argument that he was unlawfully detained.

Dixon’s Consent

Dixon also asserts that the consent he gave was not valid. It is well settled that a warrantless search conducted pursuant to a valid consent is permitted by the Louisiana and United States Constitutions. State v. Raheem, 464 So.2d 293, 297 (La.1985); State v. Crews, 28,153 (La.App. 2d Cir.05/08/96), 674 So.2d 1082, 1084.
The validity of a search pursuant to a defendant’s consent hinges on the volun-tariness of the consent, which is a question of fact to be determined by the court under the facts and circumstances of each case. The factual determination of the trial judge is entitled to great weight upon review. State v. Walker, 530 So.2d 1200 (La.App. 2d Cir.1988), writ denied, 532 So.2d 763 (La.1988).
In Dixon I we cited Ohio v. Robinette, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), which held that an officer does not have to inform a defendant he is free to leave before a consent to search may be deemed voluntary. Rather, voluntariness must be determined from all the circumstances. There, a police officer questioned a defendant further after issuing a traffic violation warning. The defendant then consented to a search in which illegal drugs were discovered. The conviction was affirmed. The Robinette court held that the officer’s subjective intention did not make a continued detention illegal under the Fourth Amendment, as long as the circumstances, viewed objectively, justified the action.
InHere, the record indicates that after returning Dixon’s paperwork, Tpr. Joyner engaged Dixon in conversation and asked him if he had been arrested or had any traffic tickets. At that point in time, Dixon was not physically restrained or told he was not free to go. The evidence further shows that the answers Dixon gave Tpr. Joyner were consensual as was Dixon’s permission to search his vehicle.
We conclude that the subsequent war-rantless search was conducted pursuant to a valid consent, which is permitted by the Louisiana and United States Constitutions. See State v. Raheem, supra; State v. Crews, supra. The facts and circumstances of this case support this court’s finding that the consent was voluntary. See State v. Walker, supra. We find no merit to Dixon’s argument.
CONCLUSION
For the foregoing reasons, Dixon’s conviction and sentence are affirmed.
AFFIRMED.

. The transcript shows that at this point the trial judge questioned Tpr. Joyner at length regarding when he decided to "detain” Dixon after the traffic stop, however, Tpr. Joyner responded that Dixon was not detained.

. The trial court apparently ignored or discounted the fact that Dixon lied about the ownership of the vehicle, and Dixon’s story that he was coming from Dallas to play craps at one of the Bossier City casinos but did not know the casino’s name.